**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

SHEILA ANNETTE ROYAL,       )
                            )
          Plaintiff,     )
                            )
     v.                  )      1:17CV1135
                            )
NANCY A. BERRYHILL,         )
Acting Commissioner of Social  )
Security,                 )
                            )
          Defendant.     )

## <u>MEMORANDUM OPINION AND RECOMMENDATION<br>OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff, Sheila Annette Royal, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 15; <u>see also</u> Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

## I. <u>PROCEDURAL HISTORY</u>

Plaintiff applied for DIB, alleging a disability onset date of September 1, 2013. (Tr. 182-85.) Upon denial of that application

initially (Tr. 71-88, 110-13) and on reconsideration (Tr. 89-105, 120-27), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 128-29). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 42-70.) The ALJ subsequently determined that Plaintiff did not qualify as disabled under the Act. (Tr. 14-36.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 180-81), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

1.  [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2018.

. . .

2.  [Plaintiff] has not engaged in substantial gainful activity since September 1, 2013, the alleged onset date.

. . .

3.  [Plaintiff] has the following severe impairments: Mental disorders variously characterized as depression, anxiety, agoraphobia, and alcohol use disorder in sustained remission, heart disease status post heart attack, degenerative disc disease of the cervical spine, and gastrointestinal [sic] reflux disease (GERD).

. . .

4.  [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [Plaintiff] has the residual functional
capacity to perform light work . . . except she can
frequently reach overhead bilaterally.  She must avoid
concentrated exposure to hazards such as dangerous
machinery and unprotected heights.  [Plaintiff] can
perform work that involves tasks of a nature that can be
learned within a short demonstration period of up to
approximately 30 days.  She can work primarily with
things rather than with people, such that the work
contact with others is only on an occasional basis.  She
can maintain concentration, persistence and pace at that
limited range of tasks for two hours at a time before
taking regularly scheduled breaks and returning to work.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10. Considering [Plaintiff's] age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [Plaintiff] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the . . . Act, from September 1, 2013, through
the date of this decision.

(Tr. 19-36 (internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits."  Hines v.

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope

of . . . review of [such a] decision . . . is extremely limited."

Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Even given

those limitations, the Court should remand this case for further administrative proceedings.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at

176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . .

_____

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

available in the community," the claimant qualifies as disabled.
Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ committed harmful error by failing to properly evaluate the medical opinions of (i) Dr. [Betsy M.] English and (ii) Paul Green, PA[-]C [('PA-C Green')] and support [the ALJ's] conclusions regarding the assignment of limited weight to each opinion" (Docket Entry 13 at 6 (bold font and single-spacing omitted)); and

2) "[t]he ALJ's failure to evaluate the impact of [Plaintiff's] medically determinable impairments of respiratory conditions ([chronic obstructive pulmonary disease ('COPD')], emphysema and [obstructive sleep apnea ('OSA')]) on the RFC is harmful error that prevents [the ALJ's] decision from being support[ed] by substantial evidence" (id. at 13 (bold font and single-spacing omitted)).

---

[4] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 16 at 5-19.)

## 1. Mental Health Opinions

Plaintiff's first assignment of error contends that "[t]he ALJ committed harmful error by failing to properly evaluate the medical opinions of (i) Dr. English and (ii) [PA-C Green] and support [the ALJ's] conclusions regarding the assignment of limited weight to each opinion." (Docket Entry 13 at 6 (bold font and single-spacing omitted).) According to Plaintiff, the ALJ's errors in that regard qualify as "harmful . . . since the opinions of all three [sic] of these sources establish more severe (i.e.[,] disabling) limitations, especially with regards to [Plaintiff's] ability to maintain concentration, persistence or pace in a work environment, then [sic] the ALJ determined when establishing [Plaintiff's] RFC." (Id.) Additionally, Plaintiff maintains that the ALJ erred by "assign[ing] great weight to the opinions of the non-examining [s]tate agency [psychological] consultants, Daniel Nelson, Psy.D. and Helen Shapiro, Ph.D., as well as the opinion[s] of psychological consultative examiner, Ren[ée C.] Hinson, Ph.D.," because those consultants "issued their opinion[s] . . . prior to reviewing almost the entirety of [Plaintiff's] specialized mental health treatment records" (id. at 12 (citing Tr. 31-32)) and "the severity of [Plaintiff's] mental health impairments and their negative impact on her ability to function increased as her claim

9

progressed" (id. at 13).  Plaintiff's contentions have merit and require remand.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment.  See 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").  The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference.  The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion.  See 20 C.F.R. § 404.1527(c)(2)(ii).  Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record.  See 20 C.F.R. § 404.1527(c)(2)-(4).  "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig, 76 F.3d at 590 (emphasis added).

Plaintiff first challenges the ALJ's "decision to assign limited weight to Dr. English's opinion[s] [because] she 'provided shifting opinions that appeared to be based on [Plaintiff's] changing requests despite initially deferring to specialists for those same opinions.'" (Docket Entry 13 at 7 (quoting Tr. 32).) Although Plaintiff "admits that Dr. English . . . initially defer[red] to a specialist, a psychiatrist, to determine if [Plaintiff] was able to work or not" (id.), she nevertheless "contends that the ALJ's reliance on the 'shift' in Dr. English's opinions . . . is misplaced" because 1) Dr. English supported her 2015 and 2016 opinions regarding Plaintiff's declining mental capacity with her own first-hand treatment observations (see id.); 2) "there was a period of over a year between Dr. English's earlier and later opinions (id. at 9-10); and 3) "treatment records and reports by [Plaintiff] clearly reflect worsening of [her] mental impairments, despite treatment" (id. at 10 (citing Tr. 249, 255-56, 439-40, 505-11, 566-80, 636-41, 642-45, 648)). According to Plaintiff, "[t]he ALJ's failure to assign great weight to Dr. English's opinion[s] and assess appropriate limitations in the RFC for [Plaintiff's] well supported limitations in her ability to recall, focus, concentrate and tolerate stress is harmful error that prevents the ALJ's decision being supported by substantial evidence." (Id.)

Dr. English, Plaintiff's treating internist, provided <u>five</u> different (and progressively more restrictive and detailed) medical opinions regarding the impact of Plaintiff's impairments on her ability to work:

- At an annual physical examination on December 13, 2013, Dr. English agreed to complete a form under the Family and Medical Leave Act ("FMLA") recommending that Plaintiff take a three-week leave of absence from work from December 12, 2013, to January 2, 2014, to allow Plaintiff time to adjust to a new anti-depressant medication (<u>see</u> Tr. 403);

- On May 2, 2014, Dr. English opined as follows:

    > [Plaintiff remains] under the excellent care of [psychiatrist] Dr. [Bryan Greene] Smith. . . .
    >
    > At this point, I do not see a <u>medical</u> reason which would cause restrictions or prevent [Plaintiff] from returning to work. <u>She does seem to suffer greatly from anxiety, I can see that this would inhibit her ability to work</u>. She has just had one visit with her psychiatrist, and I've encouraged her strongly to continue to work with him. I realize that finances and her high deductible so [sic] prevented her from being willing to see the psychiatrist in the past, as she didn't f[ee]l that she could afford to. <u>I now think she can't afford not to see the specialist</u>.
    >
    > If she is to be signed out of work, I have asked that she get this from her specialist.

(Tr. 380 (emphasis added));[5]

- On July 27, 2015, Dr. English observed that Plaintiff "ha[d] multiple medical problems" and "very significant psychiatric issues," and that Dr. English "d[id] not [b]elieve that [Plaintiff would] be able to return to gainful employment" (Tr. 643 (emphasis added));

- On October 29, 2015, Dr. English provided the following medical observations and opinions:

> Ability to work - [Plaintiff] states she is having a hard time getting her records from her past psychiatrist and that she is having a difficult time getting her work restrictions. I do not know what her specific diagnosis is, I've known her for 20 years as a patient.
>
> Since about [the] time [of her] heart attack she has become very irritable, disorganized, forgetful, often misses appointments, cannot stay on track with the conversation. She can be very difficult to deal with on the phone, she rambles, repeats herself multiple times, [u]nderstands the instructions very poorly despite my repeating them multiple times. I give[] [them] to her in a written form, she loses them or misplaces them[.]
>
> . . .
>
> She has a cardiac condition, I do not think that prevents her from working. I do think the back pain, the narcotics, and the cardiac condition [are]

    [5] The record reflects that Dr. Smith treated Plaintiff from April 21, 2014, to September 25, 2015, but does not contain any work restrictions from either Dr. Smith, or the licensed clinical social worker providing therapy for Plaintiff under Dr. Smith's direction, Joy Marcum. (See Tr. 437-42, 507-11, 636-40, 648.) Dr. Smith discharged Plaintiff from his care on September 25, 2015, for five no-shows and/or late cancellations. (See Tr. 648.)

contributing to her disability.  I think her main disability is her psychiatric/emotional problem.  While I am not certain of the entire diagnosis, I do know she is depressed, but there seems to be something more.  I am delighted she has seen a psychiatrist.  I cannot imagine a job that she would be suited for, it is my medical opinion that she is disabled from gainful employment.

(Tr. 651-52 (emphasis added));

- Lastly, on August 2, 2016, Dr. English stated the following:

I do feel that her pain medications prescribed to her by the pain clinic [] make it harder for her to do mental work, as she is on both gabapentin and a n[arc]otic.

. . .

[Plaintiff] had onset of depression after her myocardial infarction.  She has never really pulled out of the depression.

I'm a patient at the dental practice where [Plaintiff] used to work.  I had the opportunity to see her at work when [I was] there [a]s a patient.  After the [myocardial infarction] she performed very poorly, she was irritable on the phone, irritable with her workers, had a hard time following a train of thought. This was a definite change from before her myocardial infarction.  She [was] much more efficient, and organized[.]

She is disorganized, cannot seem to keep appointments, repeats he[rs]elf, is irritable, often doesn't really seem to comprehend what I'm saying to her. . . .

She has missed many appointments with specialists, she is hard to reach, she

> seems overwhelmed. It is my sincere
> belief that this is not intentional
> malingering on her behalf, but that her
> mental state is such that she cannot get
> organized, she doesn't understand how to
> program her phone. She doesn't know how
> to set her answering machine . . . .
>
> I think that she is disabled from gainful
> employment. She says it is a distinction
> as to whether or not it began after her
> myocardial infarction, and in my opinion
> it did.

    (Tr. 665 (emphasis added)).

The ALJ discussed and weighed Dr. English's opinions as follows:

> I assign limited weight to the opinions of [Plaintiff's] primary care provider, [Dr. English]. Dr. English provided shifting opinions that appeared to be based on [Plaintiff's] changing requests, despite initially deferring to specialists for those same opinions. For example, in late 2013 Dr. English provided a work excuse for less than one month while [Plaintiff] adjusted to new medications. She released [Plaintiff] to work several months later by providing an opinion stating that [Plaintiff's] heart condition would <u>not</u> prevent her form working and that she should <u>not</u> be placed on disability without being seen by a psychiatrist. Yet in late 2015, Dr. English stated that [Plaintiff] was 'disabled from gainful employment,' and that [Dr. English] could not 'imagine a job that [Plaintiff] would be suited for.' At the same time, Dr. English explained that she did not believe [Plaintiff's] cardiac condition prevented her from working, and that while the combination of back pain, narcotics, and her heart condition contributed to disability, [Dr. English] believed [Plaintiff's] main issue was 'psychiatric/emotional.' However, in that regard [Dr. English] admitted that 'I've known [Plaintiff] for 20 years as a patient' and 'I do not know what her specific diagnosis is.' Finally, in August 2006, Dr. English suggested that prescription gabapentin and narcotics made it harder for [Plaintiff] to perform mental work, and that she was 'disabled from gainful

employment.' However [Plaintiff] repeatedly denied sedation or confusion from her medications. In addition, the statements describing [Plaintiff] as 'disabled' contemplate an administrative finding dispositive of a case. These issues are reserved to the Commissioner, and as such are not entitled to any special significant weight.

(Tr. 32-33 (internal citation omitted, emphasis in original).) The ALJ erred in his evaluation of Dr. English's opinions.

First, the ALJ failed to expressly evaluate Dr. English's opinions under the regulatory factors (see Tr. 32-33), which include (1) the length and frequency of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinions; (4) the consistency of the opinions with the record; (5) whether the opinions concern matters within Dr. English's area of specialty; and (6) any other factors that may support or contradict the opinions, see 20 C.F.R. § 404.1527(c)(2) - (c)(6). That failure by the ALJ does not qualify as harmless error, see generally Fisher v. Bowen, 869 F.3d 1055, 1057 (7th Cir. 1989) (holding that "[n]o principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result"), as several of those factors strongly favor according Dr. English's opinions significantly more deference than the "limited weight" assigned by the ALJ here (Tr. 32).

In that regard, factor (1) would strongly support according more weight to Dr. English's opinions, as the record reflects that Dr. English treated Plaintiff for at least 20 years (see Tr. 651), and that Plaintiff visited Dr. English on average every three months throughout the relevant time period in this case (see Tr. 379-412, 420-31, 626-35, 641-47, 651-70 (containing 16 treatment notes from Dr. English during the approximately four-year period from July 19, 2012, to August 2, 2016)). Moreover, respecting factor (3), Dr. English supported her opinions regarding Plaintiff's mental functioning with multiple examples of her own observations of Plaintiff, both clinically and as a patient of the dentist where Plaintiff previously worked. (See Tr. 651-52, 665.) Similarly, factor (4) supports greater credit for Dr. English's opinions, because those opinions remain consistent with the overall record, which demonstrates a significant worsening of Plaintiff's mental conditions in 2015 and 2016 (see, e.g., Tr. 508 (3/11/15 note reflecting Plaintiff went three to four days without bathing), 566 (8/31/16 treatment record observing more dysphoria, a blunter affect, minimal eye contact, and poor dress and grooming), 578 (10/30/15 note recording Plaintiff's disheveled appearance, markedly slowed psychomotor activity, and impairment of memory and mental function), 579 (10/28/15 note documenting slumped posture, poor eye contact, hesitant speech, blunted affect, frequent sighing, and losing track of narrative several times), 608 (7/25/16

office visit noting Plaintiff's unkempt, fatigued appearance)). Given that multiple Section 404.1527(c) factors support greater deference to Dr. English's opinions than the "limited weight" afforded by the ALJ (Tr. 32), the ALJ's failure to analyze and weigh Dr. English's opinions under those factors requires remand. See McCoy v. Astrue, No. 0:10-CV-1473-RMG, 2011 WL 2632675, at *4 (D.S.C. July 5, 2011) (unpublished) (remanding case where ALJ failed to analyze treating physician's opinion under the regulatory factors set forth in 20 C.F.R. § 404.1527(c)).

Second, the ALJ completely overlooked Dr. English's opinions regarding the impact of Plaintiff's mental impairments on her ability to function, neither mentioning them in his recitation of the record evidence (see Tr. 26-31), nor discussing (much less weighing) them in his analysis of Dr. English's opinions (see Tr. 32-33).[6]  The ALJ instead honed in on Dr. English's opinions that

---

[6] The ALJ may have implicitly chosen not to discuss or weigh Dr. English's opinions regarding Plaintiff's mental functioning because Dr. English, as an internist, does not constitute a specialist in mental health.  However, Dr. English's status as an internist merely constitutes one factor among many that the ALJ must consider in evaluating and weighing Dr. English's opinions, see 20 C.F.R. § 404.1527(c)(5), and does not constitute a grounds on which to ignore or outright dismiss opinions outside her area of specialization.  See Brown v. Ryan's Family Steak House, Inc., 113 F. App'x 512, 516 (4th Cir. 2004) (noting that internist served as the claimant's "treating physician for sixteen years" and "[t]he fact that [the doctor's] practice is internal medicine rather than neurology does not negate the fact that he is a qualified physician with more first-hand knowledge concerning [the claimant's] physical and mental well-being than any other medical professional"); Jandle v. Commissioner of Soc. Sec., No. 1:17-CV-78, 2018 WL 344972, at *9 (S.D. Ohio Jan. 8, 2018) (unpublished) (deeming the claimant's treating internist "authorized to provide an opinion on plaintiff's level of mental functioning" and noting that internist's "lack of specialization in mental health [wa]s an appropriate factor for the ALJ to balance" (citing 20 C.F.R. § 404.1527(c)(5)), recommendation adopted, 2018 WL 1123670 (S.D. Ohio Mar. 1, 2018) (unpublished); Marsh v. Astrue, No. 5:10-CV-438,

Plaintiff's <u>physical</u> impairments did not disable her, and dismissed Dr. English's opinions that Plaintiff qualified as disabled from gainful employment as dispositive matters reserved for the Commissioner. (<u>Id.</u>; <u>see</u> 20 C.F.R. § 404.1527(d)(1).) The ALJ's failure to weigh (or even address) Dr. English's opinions on Plaintiff's <u>mental</u> functioning holds particular significance, because Dr. English (1) initially treated Plaintiff for depression and anxiety herself until Plaintiff's symptoms reached a severity level that Dr. English believed warranted referral to a psychiatrist and/or therapist (<u>see</u> Tr. 379-413, 424-30); (2) detailed multiple mental symptoms, including forgetfulness, confusion, lack of focus, and an inability to follow instructions, that she <u>personally</u> observed in Plaintiff, both clinically and as a patient at the dental practice where Plaintiff formerly worked (<u>see</u> Tr. 651-52, 665); and (3) had treated Plaintiff for 20 years and could therefore compare and contrast Plaintiff's mental functioning before and after her heart attack (<u>see</u> Tr. 651, 665). Significantly, Dr. English's opinions regarding Plaintiff's mental functioning, and particularly, her forgetfulness, confusion, lack of focus, and inability to comprehend instructions, directly

---

2011 WL 4809271, at *5 (N.D. Ohio Oct. 11, 2011)(unpublished) (finding ALJ's implicit rejection of internist's "opinions because they concerned issues outside of the doctor's area of expertise . . . erroneous because [the internist's] treatment of [the p]laintiff, which lasted for over a decade, provided the doctor with considerable insight into [the plaintiff's] mental state" and "led [the internist] to prescribe [the p]laintiff anxiety medication and . . . to refer [the plaintiff] to a [mental health] professional").

conflict with the ALJ's RFC and dispositive hypothetical question, which both assume that Plaintiff remained able to maintain concentration, persistence, and pace for two hours at a time (see Tr. 25, 66). Under such circumstances, the ALJ's failure to discuss and weigh Dr. English's opinions regarding Plaintiff's mental functioning . See Love-Moore v. Colvin, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (unpublished) (holding that, where physician's opinion conflicts with RFC, "the ALJ's failure to consider [that] physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand" (citing, inter alia, Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006)), aff'd sub nom Moore v. Colvin, 584 F. App'x 155 (4th Cir. 2014).

The Court should also find merit in Plaintiff's argument that the ALJ erred by "assign[ing] great weight to the opinions of the non-examining [s]tate agency [psychological] consultants, [Drs. Nelson and Shapiro], as well as the opinion[s] of psychological consultative examiner, [Dr. Hinson]," because those consultants "issued their opinion[s] . . . prior to reviewing almost the entirety of [Plaintiff's] specialized mental health treatment records" (Docket Entry 13 at 12 (citing Tr. 31-32)) and "the severity of [Plaintiff's] mental health impairments and their negative impact on her ability to function increased as her claim progressed" (id. at 13). As a general matter, opinions from a

treating source deserve greater weight than those from a non-treating source, see 20 C.F.R. § 404.1527(c)(2), and opinions from an examining source warrant more deference than those from a non-examining source, see 20 C.F.R. § 404.1527(c)(1). Notwithstanding those general precepts, an ALJ can still reject treating source opinions in favor of opinions from non-examining state agency consultants and non-treating consultative examiners, who typically render their opinions without the benefit of a full record, but only to the extent the non-examining and non-treating sources' opinions remain consistent with the evidence received subsequent to their opinions. See Lapeer v. Astrue, No. 5:08-CV-256-D(1), 2009 WL 2487038, at *7 (E.D.N.C. Aug. 13, 2009) (unpublished).

Here, the ALJ afforded "great weight" to the opinion of the non-examining state agency psychological consultant Dr. Nelson (Tr. 31), who concluded on September 18, 2014, that Plaintiff could perform simple, routine, repetitive tasks in a low stress workplace setting with minimal social demands (see Tr. 83-85), as well as to Dr. Nelson's counterpart on reconsideration, Dr. Shapiro (Tr. 31), who opined on February 2, 2015, that "there is no objective evidence of worsening" of Plaintiff's mental condition (Tr. 103 (emphasis added)), and that Plaintiff remained able to carry out simple tasks in a stable, low stress environment with minimal social demands for two-hours periods over an eight-hour day at a

non-production pace (see Tr. 100-03).[7] The ALJ further gave "great weight" to the opinions of consultative psychological examiner Dr. Hinson (Tr. 32), who proffered a report on June 17, 2014, concluding that Plaintiff had the capacity to sustain attention to perform simple, repetitive tasks, had to the ability to understand, retain and follow simple instructions, and exhibited adequate concentration, persistence, and pace (see Tr. 451).

In contrast, the ALJ accorded "limited weight" to the opinions of Dr. English (Tr. 32-33), including detailed and thorough opinions dated October 29, 2015 (see Tr. 651-52), and August 2, 2016 (see Tr. 665). The ALJ also afforded "limited weight" to the opinions of PA-C Green (Tr. 33), who opined on November 10, 2015, that Plaintiff remained "totally incapacitated" with poor memory, and could not do any work that required focus and concentration (see Tr. 577), and concluded on February 3, 2016, that Plaintiff suffered from "[t]otal incapacity" due to, inter alia, shaking, crying, depression, severe anxiety, extremely poor memory, and agoraphobia (Tr. 689). In a similar vein, the ALJ assigned "limited weight" to the opinions of Licensed Clinical Social Worker

---

[7] Although the ALJ claimed to give "great weight" to the state agency psychological consultants' opinions (Tr. 31), the ALJ neither included nor explained the omission of the consultants' limitations to low stress, non-production work in the RFC (see Tr. 25-34) or dispositive hypothetical question (see Tr. 66). On remand, the ALJ should clarify which portions of the consultants' opinions the ALJ credits and, if he does not adopt all portions, explain his decision-making.

Cheri Henry (Tr. 33), who recommended on October 28, 2015, that Plaintiff not return to work due to impairment in concentration and focus, as well as "mood dysregulation" (see Tr. 579).

As discussed above, the record subsequent to the 2014 and (early) 2015 non-examining/non-treating opinions documents that, in (later) 2015 and 2016, Plaintiff suffered clearly worsening mental symptoms. (See, e.g., Tr. 508, 566, 578, 579, 608.) Under such circumstances, the ALJ reversibly erred by rejecting three more recent treating source opinions in favor of more remote non-examining and non-treating sources who did not have the opportunity to review the significant evidence of Plaintiff's worsening mental health in 2015 and 2016. See Valley v. Astrue, No. 3:11-CV-260-HEH, 2012 WL 3257861, at *16 (E.D. Va. June 22, 2012) (unpublished) (rejecting ALJ's reliance on early evidence to discount a later treating physician's opinion without adequately accounting for the plaintiff's deteriorating condition), recommendation adopted, 2012 WL 3257876 (E.D. Va. Aug. 8, 2012) (unpublished); Pierce v. Astrue, No. 09-CV-813 GTS/VEB, 2010 WL 6184871, at *6 (N.D.N.Y. July 26, 2010) (unpublished) (finding that, given the claimant's worsening condition, ALJ should not have discounted more recent medical opinion in favor of medical assessment completed prior to worsening of the claimant's condition), recommendation adopted, 2011 WL 940342 (N.D.N.Y. Mar. 16, 2011) (unpublished).

In sum, Plaintiff's first assignment of error demonstrates entitlement to remand.[8]

## 2. Respiratory Impairments

Lastly, Plaintiff asserts that "[t]he ALJ's failure to evaluate the impact of [Plaintiff's] medically determinable impairments of respiratory conditions (COPD, emphysema and OSA) on the RFC is harmful error that prevents [the ALJ's] decision from being support[ed] by substantial evidence." (Docket Entry 13 at 13 (bold font and single-spacing omitted).) In particular, Plaintiff maintains that "[t]he ALJ fail[ed] to discuss any of the objective test results and/or evidence regarding [Plaintiff's] respiratory impairments," and argues that a proper analysis of those impairments "would result in significant environmental restrictions," such as "a limitation to avoid exposure to pulmonary irritants, extreme temperatures, humidity and toxic chemicals/agents," as well as "further restrict her exertional and postural abilities, including her ability to stand and walk, lift and carry, push and pull, climb, squat, stoop and crouch." (Id. at 15.) Plaintiff further contends that "[h]er OSA causes her daytime somnolence [and] the fatigue she experiences . . . would negatively

---

[8] In light of the fact that, upon remand, the ALJ will reevaulate all of the mental health opinion evidence of record and, in turn, the RFC, the Court need not reach Plaintiff's remaining arguments challenging the ALJ's analysis of PA-C Green's opinions (see Docket Entry 13 at 10-12).

impact her ability to maintain her focus and concentration." (Id.) at 15-16.)

Contrary to Plaintiff's allegation that "[t]he ALJ fail[ed] to discuss any of the objective test results and/or evidence regarding [Plaintiff's] respiratory impairments" (id. at 15), the ALJ did discuss evidence pertaining to Plaintiff's respiratory ailments, including the results of objective testing such as a chest x-ray, pulmonary function testing, and a chest CT scan, at step two of the SEP:

> There is objective evidence in the medical record that [plaintiff] has been evaluated for [COPD], emphysema and [OSA]. [Plaintiff] underwent pulmonary function testing in mid-2016. An x-ray identified minor left lung base atelectasis versus scar[r]ing but she did not complete pulmonary function testing secondary to "poor effort." The results showed a restrictive defect that was not corroborated by her radiologic findings. [Plaintiff] was informed her symptoms would not improve unless she quit smoking, and that smoking cessation would be more effective than drug therapy. Her doctor concluded an inhaler was not indicated as [Plaintiff] did not show the requisite obstruction. However, a subsequent chest [CT] scan provided evidence of emphysema and [Plaintiff] was diagnosed with that condition in June 2016. Accordingly, the evidence of record does not establish her respiratory conditions have imposed more than minimal restriction on [Plaintiff's] ability to perform basic work activities for more than 12 continuous months during the relevant period, and are thus nonsevere.

(See Tr. 20 (internal citations omitted and emphasis added).)

Furthermore, Plaintiff has not shown how the evidence relating to her respiratory impairments would have compelled the ALJ to "further restrict [Plaintiff's] exertional and postural abilities,

including her ability to stand and walk, lift and carry, push and pull, climb, squat, stoop and crouch." (Docket Entry 13 at 15.) That evidence, as summarized by the ALJ (see Tr. 20), reflects that Plaintiff did not seek treatment with chest specialists for shortness of breath until May 26, 2016 (see Tr. 617), less than six months before the ALJ's decision (see Tr. 36).[9] Moreover, based on Plaintiff's continued smoking, poor effort on pulmonary function testing, and the lack of correlation between obstruction shown on pulmonary function tests and radiologic testing, her chest specialists refused to prescribe inhalers. (See Tr. 617-21.) Even after a CT scan on June 2, 2016, documented mild to moderate emphysema (see Tr. 616), and Plaintiff's specialists prescribed two inhalers (see Tr. 611-14), the record contains only one additional visit on July 25, 2016, at which the specialists continued Plaintiff's medications and recommended a sleep study to rule out OSA (see Tr. 606-09). In addition, the record contains neither any work-related restrictions from Plaintiff's chest specialists, nor evidence of a sleep study. (See Tr. 606-21.) In short, Plaintiff has failed to demonstrate how this evidence would have compelled the ALJ to adopt more restrictive exertional and postural

_____

[9] The record contains complaints by Plaintiff of shortness of breath and/or obstructed sleep on May 15, 2014 (see Tr. 543), April 27, 2015 (see Tr. 628), and July 27, 2015 (see 642-44); however, none of those office visits resulted in a definitive diagnosis of COPD, emphysema, or OSA, specific medical treatment or prescription medications for those impairments, or work-related restrictions arising specifically out of those impairments (see Tr. 543, 628, 642-44).

restrictions in the RFC (and/or dispositive hypothetical question).[10]

Lastly, assuming _arguendo_ that the ALJ erred by failing to include "a limitation to avoid exposure to pulmonary irritants, extreme temperatures, humidity and toxic chemicals/agents" (Docket Entry 13 at 15) in the RFC, any such error by the ALJ would remain harmless under the circumstances of this case. _See generally Fisher_, 869 F.3d at 1057 (holding that "[n]o principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result"). The Inspector and Hand Packager job cited by the VE (_see_ Tr. 67) and adopted by the ALJ at step five of the SEP (_see_ Tr. 36) does not involve exposure to weather, heat, cold, wetness/humidity, atmospheric conditions, toxic/caustic chemicals or other environmental conditions. _See_ G.P.O., _Dictionary of Occupational Titles_, No. 559.687-074 ("Inspector and Hand

_____

[10] To the extent Plaintiff argues that the ALJ should have found Plaintiff's respiratory impairments severe at step two (_see_ Docket Entry 13 at 14 (alleging that "the ALJ offer[ed] no explanation for his conclusion that the 'medical evidence does not support that these impairments would cause more than minimal limitation fo a duration of at least 12 months'")), that argument fails. As the ALJ found (_see_ Tr. 20), Plaintiff's regular treatment with chest specialists did not begin until May 2016 (_see_ Tr. 617), and her diagnosis of emphysema occurred in June and July 2016 (_see_ Tr. 611-16). Thus, as of the date of decision on November 14, 2016 (_see_ Tr. 36), "the evidence of record d[id] not establish [Plaintiff's] respiratory conditions . . . imposed more than minimal restriction on [Plaintiff's] ability to perform basic work activities _for more than 12 continuous months during the relevant period_" (Tr. 20 (emphasis added)).

Packager"), 1991 WL 683797 (4th ed. rev. 1991); see also Selected
Characteristics of Occupations Defined in the Revised Dictionary of
Occupational Titles, App'x D, ¶ 7 (U.S. Dep't of Labor 1993)
("SCO") (defining "[a]tmospheric [c]onditions" to include "fumes,
noxious odors, dusts, mists, gases, and poor ventilation, that
affect the respiratory system, eyes, or the skin").  The VE
testified that 337,000 Inspector and Hand Packager jobs existed in
the national economy (see Tr. 67) (testimony which the ALJ later
adopted (see Tr. 36)), and that number clearly qualifies as
"significant" under Fourth Circuit precedent, see Hicks v.
Califano, 600 F.2d 1048, 1051 (4th Cir. 1979) ("[The c]laimant
contends that the light and sedentary jobs described by the
vocational expert . . . do not exist in significant numbers within
the region.  We do not think that the approximately 110 jobs
testified to by the [VE] constitute an insignificant number.").

Simply put, Plaintiff has not demonstrated error with respect
to the ALJ's evaluation of Plaintiff's respiratory impairments.[11]

---

[11] Given the passage of time since the ALJ's decision in this case on
November 14, 2016 (see Tr. 36), the possibility exists that Plaintiff now
possesses sufficient evidence of the impact and duration of her respiratory
ailments to establish them as severe impairments.  Upon remand, the ALJ should
reconsider, in light of any new evidence and/or testimony, whether Plaintiff's
respiratory conditions qualify as severe.

### III. CONCLUSION

Plaintiff has established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated and that the matter be remanded under sentence four of 42 U.S.C. § 405(g), for further administrative proceedings to include reevaluation of the mental opinion evidence in accordance with 20 C.F.R. § 404.1527.  As a result, Plaintiff's Motion for Summary Judgment (Docket Entry 12) should be granted in part (i.e., to the extent it requests remand), and Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) should be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 29, 2019